FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
3:57 pm, Sep 30, 2013
SUE BEITIA, CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| UNITEK SOLVENT SERVICES, INC., a Hawaiʻi Corporation,<br><br>     Plaintiff/Counterclaim-<br>     Defendant,<br><br>vs.<br><br>CHRYSLER GROUP LLC, a Delaware Limited Liability Company,<br><br>     Defendant/Counterclaim-<br>     Plaintiff. | CIVIL NO. 12-00704 DKW-RLP<br><br>**ORDER DENYING PLAINTIFF UNITEK SOLVENT SERVICES, INC.'S MOTION FOR PRELIMINARY INJUNCTION** |

## ORDER DENYING PLAINTIFF UNITEK SOLVENT SERVICES, INC.'S MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Before the Court is Plaintiff Unitek Solvent Services, Inc.'s ("Unitek") Motion for Preliminary Injunction (the "Motion"). Unitek seeks a preliminary injunction preventing Defendant Chrysler Group LLC ("Chrysler") from infringing on its mark ECODIESEL. The Court held a two-day evidentiary hearing on the Motion on June 25 and June 26, 2013. After careful consideration of the supporting

and opposing memoranda, the documentary and testimonial evidence, the arguments of counsel, and the relevant legal authority, the Motion is DENIED.

## BACKGROUND

This dispute arises out of Chrysler's use of a specific EcoDiesel design mark for an upcoming line of Chrysler vehicles with diesel engines.   Since 2006, Unitek has had the term "ECODIESEL" registered on the Supplemental Register of the United States Patent and Trademark Office ("USPTO") as a name for the recycled fuel that it produces.

### A.    Unitek and ECODIESEL Fuel

Unitek is a "Hawaiʻi based-corporation focused on the recycling, reclamation and re-use industry."   Direct Testimony Decl. of Blane Yamagata ("Yamagata Direct Decl.") ¶ 1.   It has been in the business of collecting used oil since 1975.   Motion for Preliminary Injunction Decl. of Blane Yamagata ("Yamagata PI Decl."), Ex. 2 (Unitek's 2004 Business Proposal to Central Pacific Bank).   Prior to and around 2004, Blane Yamagata, Unitek's President, began looking into ways to convert used oil into reusable fuel.   In 2004, as part of a business plan to grow its business in collecting used oil from the automotive and machinery servicing industries and to re-refine the oil into a usable fuel, Unitek acquired the PDX system.   The PDX system consists of a "highly specialized waste

oil refining equipment [used] to manufacture diesel fuel from used motor oil."

Yamagata Direct Decl. ¶ 2.   Under Unitek's business plan, the PDX proprietary

system allowed Unitek to process the used oil it was collecting "into a more sellable

fuel product similar to dyed diesel or off-road diesel . . . ."   Yamagata PI Decl.,

Ex. 2.

In late 2005, Mr. Yamagata decided on the term ECODIESEL as the

name Unitek would use for its PDX-processed diesel fuel.   Mr. Yamagata

explained his thought process in deciding on that name as follows:

> The word ECODIESEL is not a known word from the dictionary,
> and to my knowledge no one else had used ECODIESEL as a
> name for a fuel or for products related to or that run on fuel.   I
> made the name up.   To me, the prefix "eco" was suggestive of
> ecological or environmentally friendly solutions, because our
> fuel was created from re-claimed motor oil.   In addition, "eco"
> was suggest[ive] of the economical nature of our product, which
> we were selling for 20% less than the price of #2 diesel.
> Overall, I felt that ECODIESEL was a catchy, coined term that
> would suggest the "green," environmentally-friendly, and lower
> cost qualities of our fuel.

Yamagata Direct Decl. ¶¶ 10, 11.

On December 2, 2005, Unitek's Vice-President Sally Davis filed a

trademark application to register the ECODIESEL mark with the USPTO.   Decl. of

Sally Davis ("Davis Decl.") ¶ 2.   As part of the trademark application, Davis, on

behalf of Unitek, represented that "the mark is in use in commerce on or in

3

connection with *all* goods or services listed in the existing registration for this specific class:   Diesel fuel; Fuel for motor vehicles, namely Diesel . . . ."   Davis Decl., Ex. A (Trademark Application) at UNITEK000015 (emphasis in original).

Although Unitek initially filed for registration of the mark on the Principal Register, Unitek eventually amended its application on September 5, 2006 to register the mark on the Supplemental Register instead.   Shortly thereafter, the USPTO approved the application and on October 31, 2006, Unitek's ECODIESEL mark was registered on the Supplemental Register.   The Supplemental Register entry indicates that the mark is for "diesel fuel" and "fuel for motor vehicles, namely diesel."   Decl. of Judith Powell ("Powell Decl."), Exs. D, E.

Since Unitek's acquisition of the PDX system in 2004, the fuel produced by that system has not met the specifications necessary to sell the fuel as a substitute for #2 Diesel (i.e., typical diesel fuel for automobiles), specifically with regard to the sulfur level in the fuel.   Beginning in 2004 and continuing for several years, Unitek had the properties of its fuel tested repeatedly in comparison to the properties of #2 Diesel.   Those test results indicated that the sulfur level in Unitek's fuel was too high to meet the standards of #2 Diesel.   Yamagata Direct Decl. ¶¶ 2, 4, 8.

4

Unable to market its fuel in any way as a comparable fuel to #2 Diesel for motor vehicles, Unitek sold its PDX-generated fuel to Grace Pacific, an asphalt company that has been purchasing the ECODIESEL fuel for use in its industrial machinery.   Unitek admits that from December 2005 until May 2013, Grace Pacific is the only customer that has actually purchased Unitek's ECODIESEL fuel. Yamagata PI Decl. ¶ 20.

After the filing of this lawsuit, and approximately one month prior to the hearing on the Motion, Paul Godfrey, a consultant for Unitek, announced that "Unitek can now implement a filtration process that reduces the sulfur content enough to produce ECODIESEL fuel that is EPA-compliant, #2 diesel fuel, suitable for highway use."   Yamagata Direct Decl. ¶ 28.   Mr. Godfrey had been working with Unitek for years in trying to develop a process that would make ECODIESEL compliant with the requirements for #2 Diesel.   According to Mr. Godfrey:

> The testing of the ECODIESEL fuel produced by the new process, which has been verified by Summit Environmental Technologies, Inc., shows that the improved ECODIESEL exceeds the EPA standards for ASTM D-975, and is cleaner, contains fewer contaminates, and has less sulfur than the standard #2 diesel currently sold by the major oil companies across the nation.   Once implemented, from a regulatory standpoint Unitek should be able to market and sell its ECODIESEL to any outlet that supplies #2 diesel for highway vehicles.

Decl. of Paul Godfrey ("Godfrey Decl.") ¶ 10.   At the hearing, Mr. Godfrey testified that his testing was based on a single test of two gallons of sample fuel sent to him by Unitek.   Consequently, the ability to produce the low-sulfur ECODIESEL on a commercial scale was yet unproven.   Mr. Godfrey also testified that he had not yet determined what would be done with the clay-like substance that is a by-product of the process that reduces the sulfur level in ECODIESEL.

Mr. Yamagata also testified at the hearing that he had just submitted an application for registration of Unitek's ECODIESEL fuel with the United States Environmental Protection Agency ("EPA").   Months after the hearing, on September 24, 2013, Unitek filed (without leave) a Notice of EPA Registration of ECODIESEL for On-Road Use.   Dkt. No. 158.   Attached to that filing was a letter from the EPA, dated September 19, 2013, which notified Mr. Yamagata that the EPA had registered ECODIESEL per 40 C.F.R. § 79.13.   *Id.* Ex. A (Sep. 19, 2013 EPA Letter).   Chrysler objected to Unitek's post-hearing submissions on September 30, 2013.   Dkt. No. 159.

### B.   Chrysler and the EcoDiesel Line of Vehicles

To provide a line of more fuel-efficient vehicles, Chrysler announced in early 2013 that it would offer its Jeep Grand Cherokee, Dodge Ram, and ProMaster van models with optional diesel engines.   As part of the marketing for

these new diesel-engine vehicles, Chrysler did internal research and developed the name "EcoDiesel" to be used on specifically designed badges that would be placed on the exterior of the vehicles, and, in some cases, on the engine cover.   Decl. of James Morrison ("Morrison Decl.") ¶¶ 7, 12, 14; Decl. of Robert Hegbloom ("Hegbloom Decl.") ¶¶ 7, 9.

After coming up with the EcoDiesel name for its engines, Chrysler's trademark counsel, Donna Berry, conducted a search for the use of the terms "eco" and "diesel" in federal and state trademark registers:

> This report revealed extensive use of "diesel" as a generic term to refer to diesel engines and diesel fuel and equally extensive use of "eco" as a descriptive term to describe the characteristics of being environmentally friendly, ecologically minded, economical, or otherwise efficient with respect to conserving energy and reducing carbon emissions into the environment. Unitek's "EcoDiesel" Supplemental Register registration was one such use that appeared in the report. . . . This clearance process also revealed several abandoned or cancelled registrations and applications for "EcoDiesel," along with Unitek's Supplemental Register registration.   For example, the search results indicated that Rentech, Inc. applied to register the term for "diesel fuels and blends of diesel fuels . . ." in April 1999 (U.S. Ser. No. 75/681,034); Clean Fuels Technology, Inc. applied to register it for "fuels, namely emulsions of diesel fuels . . ." in August 2001 (U.S. Ser. No. 78/078,171); and an individual, Jeff Gordon, applied to register Eco-Diesel for "blended diesel fuel containing ecologically sound fuel additives, biodiesel fuel, and vegetable oil for use as alternatives to traditional diesel fuel" in August 2003 (U.S. Ser. No. 78/294,412). . . . Since trademark applications on the Principal

7

Register are published for opposition (unlike applications on the Supplemental Register), Mr. Gordon's Eco-Diesel trademark application precipitated notices of opposition from Exxon Mobil Corporation, ChevronTexaco Corporation, and BP P.L.C., each maintaining the term "ecodiesel" is a generic name for fuel, or at best, merely descriptive and unregistrable in the absence of secondary meaning.

Decl. of Donna Berry ("Berry Decl.") ¶¶ 2–4; *Id.*, Exs. A, B.   Considering the search results revealed the existence of several past trademark applications, Chrysler concluded that it would not seek any exclusive right to use the term "eco" or "diesel," but would instead apply to register, on the Principal Register, a distinctive EcoDiesel design mark with stylized elements to use for the badges on the vehicles with diesel engines.   Chrysler submitted its trademark application to the USPTO on June 25, 2012 for the distinctive "EcoDiesel 3.0L" mark.   Berry Decl. ¶¶ 5, 6; *Id.*, Ex. C.

On September 3, 2012, the USPTO issued an Office Action to Chrysler, refusing its application to register its EcoDiesel design mark on the Principal Register.   The Office Action stated the USPTO's conclusion that "[r]egistration of the applied-for mark is refused because of a likelihood of confusion with the mark in U.S. Registration No. 3166981 [(Unitek's ECODIESEL mark on the Supplemental Register)]."   The USPTO determined that the similarity of the marks, similarity and nature of the goods and/or services, and similarity of the trade channels of the goods

8

and/or services were the most relevant factors in reaching its decision.   Specifically,
the Office Action concluded:

> The term ECODIESEL is the dominant feature of [Chrysler's]
> mark.   The addition of the descriptive wording 3.0L and the
> carrier and design elements does not change the overall
> commercial impression of the mark.   Use of [Chrysler's] mark
> and [Unitek's] mark on closely related goods is likely to result in
> confusion. . . . [Chrysler's] goods, namely, diesel engines for
> land vehicles and passenger automobiles are closely related to
> [Unitek's] goods, namely, diesel fuel for motor vehicles.   The
> goods are complementary goods that may be used together by
> the same consumer.   Use of nearly identical marks in
> connection with these goods is likely to result in confusion.

Decl. of Brett Foster ("Foster Decl."), Ex. 23.

## C.   **Adverse Proceedings**

After receiving the USPTO's refusal to register, Chrysler initiated, on
November 21, 2012, a Petition for Cancellation of Unitek's ECODIESEL mark on
the Supplemental Register, stating "abandonment" as the grounds for cancellation.
Foster Decl., Ex. 24.   Subsequently, Unitek initiated the present action on
December 28, 2012, and concurrently sought to stay the cancellation proceeding
before the USPTO Trademark Trial and Appeal Board.   On March 19, 2013, the
cancellation proceeding was suspended pending final disposition of the action
before this Court.   Foster Decl., Ex. 25.

Unitek filed the Motion on April 1, 2013, requesting a preliminary

injunction to enjoin Chrysler from "continued and prospective infringement of

[Unitek's] valid ECODIESEL trademark."   Motion at 2.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary and drastic remedy never

awarded as of right.   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24

(2008) (citation omitted).   A party "seeking a preliminary injunction must establish

that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and

that an injunction is in the public interest."   *Id.* at 20; *accord Sierra Forest Legacy*

*v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).   "That is, 'serious questions going to

the merits' and a balance of hardships that tips sharply towards the plaintiff can

support issuance of a preliminary injunction, so long as the plaintiff also shows that

there is a likelihood of irreparable injury and that the injunction is in the public

interest."   *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

2011).   *Winter* emphasized that plaintiffs seeking preliminary relief must

demonstrate that "irreparable injury is likely in the absence of an injunction."

555 U.S. at 22; *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.

2009).

## DISCUSSION

## I.   Likelihood of Success on Trademark Infringement

To prevail on a claim for infringement of a federally registered trademark under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), Unitek must establish (1) that it has a federally registered mark that is valid and protectable, and (2) Chrysler's use of a colorable imitation in commerce, without Unitek's consent, in a manner that is likely to cause confusion as to the source, affiliation, connection or association of its services.  *See Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.,* 285 F.3d 848, 853–54 (9th Cir. 2002).

### A.   Valid and Protectable Mark

Unitek contends that the ECODIESEL mark is valid and protectable because it is both inherently distinctive and because it has acquired secondary meaning.   Chrysler counters that the ECODIESEL mark is either generic or descriptive at best, and thus is not inherently distinctive.   Further, Chrysler contends that the ECODIESEL mark has not acquired the necessary secondary meaning to make it distinctive.   The Court concludes that the ECODIESEL mark is descriptive and has not acquired secondary meaning.   Thus, Unitek has not established that it has a valid and protectable mark.

It is undisputed that Unitek's ECODIESEL mark is presently registered on the Supplemental Register (although Chrysler has sought cancellation of that registration with the USPTO, which cancellation proceedings is stayed pending the resolution of this case).   Registration of a mark on the Principal Register constitutes:

> prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate [of registration].

15 U.S.C. § 1057(b).   However, registration of a mark on the Supplemental Register, as in this case, does not entitle a mark to this statutory presumption:

> [A]pplications for and registrations on the supplemental register shall not be subject to or receive the advantages of sections 1051(b), 1052(e), 1052(f), *1057(b)*, 1057(c), 1062(a), 1063 to 1068, inclusive, 1072, 1115 and 1124 of this title.

15 U.S.C. § 1094 (emphasis added).   Thus, "[r]egistration on the principal register shows that the Commissioner has determined that the mark is distinctive. Registration on the supplemental register means that the Commissioner has determined that the mark is 'capable of distinguishing.'"   *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) (quoting 15 U.S.C. § 1091(a)).

Unlike Principal Registration, "Supplemental Registration creates no substantive rights."   J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy") § 19:37.   However, because marks on the Supplemental Register are capable of being distinguished, Unitek may show that the ECODIESEL mark is valid and protectable by demonstrating that the mark has become sufficiently distinctive.   The distinctiveness of a mark is determined by considering the classification of the mark, which may fall into four categories:   (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.   *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

The latter two of these categories are entitled to trademark protection because "'imagination' or a 'mental leap' is required in order to reach a conclusion as to the nature of the product being referenced."   *Filipino Yellow Pages, Inc., v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1147 n.3 (9th Cir. 1999).   By contrast, generic terms are never protected because they "refer[] to the type or species of the product at issue."   *Rudolph Int'l, Inc. v. Realys, Inc.*, 482 F.3d 1195, 1197 (9th Cir. 2007).   Descriptive terms, which generally are not protected, may be entitled to trademark protection once the mark in question has acquired "secondary meaning" in the minds of consumers.   *Id.* at 1197–98; *see Kendall-Jackson Winery, Ltd. V. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998) ("Descriptive

13

marks are not inherently distinctive and hence do not initially satisfy the distinctiveness element.   But descriptive marks can acquire distinctiveness if the public comes to associate the mark with a specific source.   Such acquired distinctiveness, which is referred to as "secondary meaning," allows § 43 to protect descriptive marks that otherwise could not qualify for protection as trademarks."). A mark has acquired secondary meaning when "it has 'become distinctive of the [trademark] applicant's goods in commerce.'" *Filipino Yellow Pages*, 198 F.3d at 1147 (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976)).

The Court must first determine into which category the ECODIESEL mark properly fits.

### 1. The Mark is Neither Arbitrary, Fanciful, Suggestive, nor Generic

"Arbitrary or fanciful marks deserve wide protection because the trademark holder can properly expect to run into very little confusion from honest competitors." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998).   "Arbitrary marks have no relevance to any feature or characteristic of a product.   Fanciful marks are the most distinctive marks of all; they involve a high degree of imagination." *Kendall-Jackson Winery*, 150 F.3d at

1047 n.8.   "A fanciful mark is a coined word or phrase, such as Kodak, invented

solely to function as a trademark.   An arbitrary mark, such as Dutch Boy on a can of

paint, uses common words in a fictitious and arbitrary manner to create a distinctive

mark which identifies the source of the product.   In either case the trademark holder

must work hard to make consumers associate the trademark with the product."

*Dreamwerks*, 142 F.3d at 1130 n.7 (internal citation omitted).   None of the parties,

including Unitek, contends that the ECODIESEL mark meets the definition of an

arbitrary or fanciful mark, and the Court agrees.

  Unitek argues, however, that the ECODIESEL mark is suggestive.

The Court declines to so find.

  Suggestive marks "subtly connote something about the products,"

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979), in such a way that

the consumer must "'use imagination or any type of multistage reasoning to

understand the mark's significance.'"   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d

1135, 1142 (9th Cir. 2002) (quoting *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8);

*see Zobmondo Entm't, LLC v. Falls Media LLC*, 602 F.3d 1108, 1115 (9th Cir.

2010) ("[T]he most-used[] test [for determining whether a mark is suggestive] is

known as the 'imagination' test, and asks whether 'imagination or a mental leap is

required in order to reach a conclusion as to the nature of the product being

referenced.'" (quoting *Rudolph Int'l, Inc.*, 482 F.3d at 1198)); McCarthy § 11:67 ("Under the imagination test, the question is how immediate and direct is the thought process to go from the designation to some characteristic of the product."). "Examples of suggestive marks include 'Air Care' for a service that maintains medical equipment used for administering oxygen and 'Anti-Washboard' for a soap that makes scrubbing unnecessary when washing clothes." *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8 (internal citations omitted).

The Court holds that no mental leap is required in order to conclude that ECODIESEL is a reference to a diesel fuel product that is more ecological than normal diesel fuel.   Unitek concedes that one well-accepted meaning of "eco" is "environmental friendliness," and does not argue that the term "diesel" in ECODIESEL is anything other than a generic reference to diesel fuel.   Combining the terms, no imagination is required to discern that this term references ecologically-conscious diesel.   Although Unitek contends that "eco" could have meanings other than environmental friendliness, the test of suggestiveness is not what *could* be interpreted by the mark; the question for the Court is whether a mental leap is *necessary* in order to understand that mark's relationship with the product. *See Zobmondo*, 602 F.3d at 1116 ("The imagination test does not ask what information about the product *could* be derived from a mark, but rather whether a

16

mental leap is *required* to understand the mark's relationship to the product."

(internal quotation marks omitted) (emphasis in original)).   Under this test, not even

a mental hop is necessary to link ECODIESEL with Unitek's fuel product.

On the other hand, Unitek is correct that its mark is not generic.   "A

generic term is one that refers to the genus of which the particular product is a

species."   *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985);

*see* McCarthy § 12:1 ("[T]o properly be called an unprotectable 'generic name' in

trademark law, the designation must be the name of the same product or service

which it is alleged to identify the source of.").   "For instance, 'Liquid controls' is a

generic term for equipment for dispensing and mixing liquids, and 'Wickerware' is a

generic term for wicker furniture and accessories, because those terms simply state

what the product is."   *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8 (internal

citations omitted).   As Chrysler itself argues, registration of the ECODIESEL mark

on the Supplemental Register is an indication that the mark is not generic.

Opposition at 16; *see Express Diagnostics Int'l, Inc. v. Tydings*, Civ. No. 06-01346,

2009 WL 111736, at *4 (N.D. Cal. Jan. 15, 2009) ("Given that registration on the

Supplemental Register is only available to marks that are 'capable of distinguishing'

and that generic marks are never capable of distinguishing, the PTO has determined

that the . . . mark is descriptive and is not generic."); McCarthy § 12:59 ("Generic

names are not registrable on the Supplemental Register since they are not capable of distinguishing the applicant's goods or services.").

### 2.   The Mark is Descriptive But Has Not Acquired Secondary Meaning

A descriptive mark is the final category of marks that ECODIESEL may fit within.   "Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood.   Thus, 'Honey Baked Ham' is a descriptive term for a ham that has been baked with honey, and 'Honey Roast' is a descriptive term for nuts that have been roasted with honey."   *Kendall-Jackson Winery*, 150 F.3d at 1047 n.8 (internal citations omitted).   As discussed above, no mental leap or exercise of imagination is necessary to understand that ECODIESEL is a mark that describes the characteristics of Unitek's fuel product—ecologically conscious diesel. *See Zobmondo*, 602 F.3d at 1114-16.   Thus, the ECODIESEL mark is descriptive.

"Although descriptive terms generally do not enjoy trademark protection, a descriptive term can be protected provided that it has acquired secondary meaning in the minds of consumers, i.e., it has become distinctive of the trademark applicant's goods in commerce."   *Filipino Yellow Pages*, 298 F. 3d at 1147 (internal quotation marks and brackets omitted).   Chrysler contends that

18

Unitek has failed to establish that the mark has acquired the requisite secondary meaning.   The Court agrees.

"Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant."   *Id.* at 1151.

Unitek first points to the fact that it sells all of the ECODIESEL fuel that it produces.   Yamagata PI Decl. ¶ 9.   However, this uncontroverted evidence actually hurts Plaintiff's case more than it helps because it is undisputed that Unitek sells *all* of its ECODIESEL fuel to a *single* customer, Grace Pacific.   This evidence weighs against a determination of secondary meaning because it illustrates the very limited number of customers who have actually ever purchased Unitek's fuel product and who may have come to associate ECODIESEL with Unitek.   *See, e.g.*, *Wembley, Inc. v. Diplomat Tie Co.*, 216 F. Supp. 565, 583 (D. Md. 1963) ("The fact that one buyer out of all of those questioned apparently connected the [mark] with [the mark's owner] does not establish distinctiveness or secondary meaning.   Proof of distinctiveness requires more than proof of the existence of one person or of even a relatively small number of people who associate the [mark] with [the mark's

owner].”); *In re Paint Prods. Co.*, 8 U.S.P.Q.2d 1863, 1866 (T.T.A.B. 1988) (“Because these affidavits were sought and collected by applicant from ten customers who have dealt with applicant for many years, the evidence is not altogether persuasive on the issue of how the average customer for paints perceives the [mark].”).   Although Grace Pacific may associate ECODIESEL with Unitek, this is insufficient to establish that a significant segment of the relevant public would make the same association.[1]

Next, Unitek points to the advertising it has done via displays at national trade shows and other promotional materials.   Yamagata PI Decl. ¶¶ 1, 13– 15, 21–23.   However, Unitek has not provided any evidence from an impartial source to establish how the mark has acquired secondary meaning to a substantial segment of the public through Unitek’s advertising and marketing.   Instead, Mr. Yamagata provided the only testimony on the impact of Unitek’s advertising and marketing of ECODIESEL.   This is problematic given that “‘[e]vidence of secondary meaning from a partial source possesses very limited probative value.’”

---

[1] Even for Grace Pacific, there is inconsistent evidence as to the association between the ECODIESEL mark and Unitek’s fuel product.   At the hearing, three representatives of Grace Pacific testified that they were familiar with the term ECODIESEL and its use by Unitek. However, the evidence also indicates that the fuel supply agreement with Grace Pacific (which was drafted by Unitek) refers to Unitek’s fuel product as “Unitek Diesel Fuel.”   Chrysler’s Ex. 138 (Nov. 1, 2005 Fuel Supply Agreement).   Further, Grace Pacific, in its own permitting applications, referred to Unitek’s fuel product as “Unitek Diesel.” Chrsyler’s Exs. 142, 149, 156.

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011)

(quoting *Filipino Yellow Pages*, 198 F.3d at 1152).   Specifically, testimony from a

company officer about secondary meaning acquired from trade shows and other

marketing has little or no probative value if it is otherwise uncorroborated.   *Id.*

The fact that Unitek made promotional DVDs and displays, and was covered in a

single local television news story, does not do enough to show that the ECODIESEL

mark has acquired secondary meaning in the minds of consumers.

Moreover, these advertisement and promotional efforts were limited

and dated.   Mr. Yamagata represented that he advertised Unitek's fuel product

throughout Hawai'i in 2005; that he promoted Unitek at a conference in 2005 and

another in 2006; and that a local news station covered the opening of Unitek's plant

in 2006.   Yamagata Direct Decl. ¶¶ 13, 15, 16–17.   Since 2006, the only

promotional efforts that Mr. Yamagata points to are responses to unidentified

"potential customers" that inquire as to Unitek's fuel product, and to which Unitek

responds by sending a brochure and a promotional DVD.   *Id.* ¶ 23.

The Court notes that up until the time of Chrysler's alleged infringing

acts and the initiation of this lawsuit, Unitek never advertised ECODIESEL as a

diesel fuel product for motor vehicles or sold ECODIESEL to anyone for use in

motor vehicles.   *See, e.g.*, Yamagata PI Decl., Ex. 7 (stating that ECODIESEL is

not used in motor vehicles because of the high sulfur content).   Thus, any secondary meaning that could have been acquired would not have associated ECODIESEL *as a motor vehicle fuel* with Unitek.   Any evidence related to more recent advertisement efforts by Unitek to market ECODIESEL as a motor vehicle fuel, evidence of Unitek now exploring contracts to sell fuel for use in vehicles, or evidence of EPA registration of ECODIESEL is irrelevant to the determination of secondary meaning.   Unitek must establish that its mark acquired secondary meaning at the time and place that Chrysler began use of the mark.   McCarthy § 15:4; *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000).

Unitek has also not provided any survey evidence to support its argument for secondary meaning.   Although survey evidence is not required to prove secondary meaning, "'[a]n expert survey of purchasers can provide the most persuasive evidence of secondary meaning.'"   *Comm. For Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 822 (9th Cir. 1996) (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir.1989)).

Consequently, the Court concludes that Unitek has not shown a likelihood of success in establishing that ECODIESEL, as a descriptive mark, has acquired the necessary secondary meaning to entitle it to trademark protection.

22

Unitek's claim to a preliminary injunction fails for this reason alone, but the Court will also address the likelihood of confusion element, which similarly does not establish Unitek's likelihood of success on the merits of its trademark infringement claim.

### B.   <u>Likelihood of Confusion</u>

Even if Unitek could establish that its mark was valid and protectable, the Court concludes that there is also no likelihood of confusion.   The Court concludes that the USPTO's determination that there was a likelihood of confusion between the marks is entitled to no preclusive effect.   This is particularly so given the fact that the USPTO was proceeding under the assumption that the marks were being used for "closely related goods . . . namely, diesel engines for land vehicles and . . . diesel fuel for motor vehicles."   Foster Decl., Ex. 23.   The USPTO made this assumption because Unitek represented under oath, at the time of its application, that the ECODIESEL mark was in present use in commerce for fuel for motor vehicles, when in fact it was not.   Davis Decl., Ex. A (Trademark Application) at UNITEK000015.

Unitek has the burden to demonstrate a likelihood of confusion.   *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 112 (2004) ("Section 1115(b) places a burden of proving likelihood of confusion (that is,

infringement) on the party charging infringement even when relying on an

incontestable registration.").

The Ninth Circuit has set forth the following standard for

demonstrating a likelihood of confusion:

> To determine whether there is a likelihood of confusion between the parties' allegedly related goods and services, we consider the following eight [*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) ("*Sleekcraft*")] factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines.

*M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (citation

omitted).   "The test is a fluid one and the plaintiff need not satisfy every factor,

provided that strong showings are made with respect to some of them."   *Surfvivor*

*Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).   In essence,

"[t]he test for likelihood of confusion is whether a 'reasonably prudent consumer' in

the marketplace is likely to be confused as to the origin of the good or service

bearing one of the marks."   *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d

1127, 1129 (9th Cir. 1998).

### 1.   <u>Strength of the Mark</u>

As to the strength of the mark, Unitek repeats its arguments discussed above as to the inherently distinctive nature of the ECODIESEL mark and the secondary meaning that the mark has acquired.   However, as discussed above, the ECODIESEL mark is not inherently distinctive and it has not acquired secondary meaning.

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws."   *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999).   The Court considers both the conceptual strength and the commercial strength of a mark.   *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).   As with distinctiveness, "[c]onceptual strength involves classification of a mark 'along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful.'"   *Network Automation*, 638 F.3d at 1149 (quoting *Brookfield*, 174 F.3d at 1058).   "The strength of a mark is determined by its placement on a continuum of marks from generic, afforded no protection; through descriptive or suggestive, given moderate protection; to arbitrary or fanciful awarded maximum protection."   *E. & J. Gallo Winery v. Gallo Cattle*, 967 F.2d at

1291 (9th Cir. 1992) (citation and quotation marks omitted).   As already

determined above, the ECODIESEL mark is merely descriptive of the product (i.e.,

diesel fuel that is more environmentally friendly than regular #2 diesel).   Further,

the ECODIESEL mark has not acquired the requisite secondary meaning through

commercial use.   On balance, this factor therefore weighs against a finding of a

likelihood of confusion.

### 2.   <u>Proximity of the Goods</u>

Unitek contends that its ECODIESEL fuel is complementary to

Chrysler's EcoDiesel engines.

> Related goods are generally more likely than unrelated goods to
> confuse the public as to the producers of the goods.   The danger
> presented is that the public will mistakenly assume there is an
> association between the producers of the related goods, though no such
> association exists.   The proximity of goods is measured by whether the
> products are:   (1) complementary; (2) sold to the same class of
> purchasers; and (3) similar in use and function.

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th

Cir. 2011) (internal citations, quotation marks, and brackets omitted).

As discussed above, Unitek has never sold its fuel product as a fuel

for motor vehicles.   Moreover, even if it were to do so in the future (as it is

contending that it will), any proximity of goods is negated by the high degree of care

that consumers would be expected to exercise in the purchase of Chrysler's motor vehicles:

> The relevant cases not only authorize but instruct the trial courts, in making a determination as to likelihood of confusion, to consider the level of sophistication of the relevant purchasers . . . . The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products than will the average purchaser of a ball of twine . . . .

McCarthy § 23:96 (quoting *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); *see Network Automation*, 638 F.3d at 1150 (holding that proximity of goods is unimportant where "consumers exercise a high degree of care, because rather than being misled, the consumer would merely be confronted with choices among similar products.").

Thus, this factor is either neutral or weighs against Unitek.

### 3. <u>Similarity of the Marks</u>

Unitek argues that Chrysler's stylized EcoDiesel mark is exactly the same as Unitek's ECODIESEL mark.   Although the two marks share the same "ecodiesel" text, the marks are readily distinguishable by the stylized characteristics unique to Chrysler's mark.

"[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion."   *GoTo.com*, 202 F.3d at 1206.   Several axioms guide the similarity analysis: (1) "the marks must be considered in their entirety and as they appear in the marketplace;" (2) "similarity is adjudged in terms of appearance, sound, and meaning;" and (3) "similarities are weighed more heavily than differences."   *Id.* (citations omitted).

In considering the marks in their entirety, the similarity lies in the word "ecodiesel" itself.   However, examining the evidence of the many variations of "eco" and "diesel" used by many entities, *see, e.g.*, Decl. of Louie Crumbley ("Crumbley Decl."), Exs. C, E, F, G, coupled with the Court's conclusion here that the ECODIESEL mark is descriptive and has not acquired secondary meaning, Unitek cannot claim to have exclusive use of all forms of the word "ecodiesel."   *See SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012) (Observing that, in cases "where that shared word is a common one in the industry, the plaintiff is not permitted to claim right to all variants on it.").

Other than the use of the same word, the marks are quite different visually, with Chrysler's marks having a unique, stylized[2] design:



Unitek's mark, on the other hand, is simply the word "ecodiesel" with no stylized items such as a unique font, color, or any other visual characteristic:

## ECODIESEL

Thus, although the two marks may share the same sound, "they are visually distinguishable as typically used by the parties in print."  *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 897 n.1 (9th Cir. 2004).   Further, although the same word "ecodiesel" is used in both marks, the meanings are different; one refers to a fuel while the other refers to a vehicle engine.

---

[2]  At the hearing, Chrysler presented a demonstrative exhibit of the actual badge to be placed on the Jeep Grand Cherokee.   It is similar to the design of the mark included in this Order, with the addition of color:   the leaf symbol and the word "Diesel" are in green.

At best for Unitek, the Court concludes that this factor is neutral because of the shared use of the word "ecodiesel." *See Surfvivor Media, Inc.*, 406 F.3d at 633.

### 4.      Chrysler's Intent in Selecting the Mark

Unitek argues that Chrysler intended to infringe on Unitek's ECODIESEL mark.   Chrysler does not dispute that it became aware of Unitek's Supplemental Registration when Chrysler was in the process of researching the ability to use the EcoDiesel mark.   Berry Decl. ¶ 3.   However, Chrysler contends that it had no malicious intent in deciding to use the EcoDiesel mark because its research did not indicate that Unitek was using the mark in a way that would conflict with Chrysler's use, and because Chrysler determined that prior USPTO proceedings evidenced that it was unlikely that anyone could use the term "ecodiesel" exclusively in all variations.

The Court finds that this factor is neutral.   Chrysler's undisputed knowledge of the existence of Unitek's mark weighs against Chrysler.   Even if Chrysler had no malicious intent, the "[a]bsence of malice is no defense to trademark infringement." *Surfvivor Media, Inc.*, 406 F.3d at 634 (quoting *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002)).   That said, Chrysler conducted thorough research into the use of the term "ecodiesel," which research uncovered

several instances of its use with slight variations.   Berry Decl., Ex. A.   Further,

Chrysler discovered that in 2004 (prior to Unitek's registration on the Supplemental

Register), the USPTO determined (in an application for the Principal Register made

by an individual unaffiliated with anyone in this litigation) that:

> The term ECO-DIESEL is merely descriptive of the applicant's
> goods, namely, diesel fuel containing ecologically sound
> additives and known in the industry as ECO-DIESEL fuel.   The
> mark immediately names the exact nature of the goods and does
> nothing else.   Accordingly, the mark is refused registration on
> the Principal Register under Section 2(e)(1).

Chrysler's Ex. 134 at Unitek 001556.   The Court therefore concludes that the extent

of Chrysler's research, and the indication from the USPTO that a term similar to

"ecodiesel" could not be registered for exclusive use on the Principal Register,

collectively negates, from an intent perspective, the fact that Chrysler knew of the

existence of Unitek's mark on the Supplemental Register.   Thus, at best for Unitek,

this factor is neutral.

### 5.    Likelihood of Expansion of the Product Lines

Finally, Unitek contends that there is a likelihood of confusion because

of the possibility that Unitek may soon place its ECODIESEL fuel in the market for

motor vehicle fuels.   As noted above, there is little evidence that prior to Chrysler's

initial use of its mark, Unitek could even market its ECODIESEL (either in the

present or the future) as a fuel for motor vehicles.   More recently, Unitek proffered statements from Mr. Godfrey that Unitek may be able to adapt its refining process in order to produce fuel that could be sold for motor vehicles.   Godfrey Decl., Ex. B. Unitek has also purportedly registered ECODIESEL (the sulfur-reduced version) with the EPA.   Dkt. No. 158, Ex. A.

At this juncture, however, the Court is not convinced that Unitek will be able to produce its fuel on a commercial scale for motor vehicles.   Unitek admits that no plan has yet been developed on how to manage the significant waste by-products that will be generated by the new sulfur-reducing process.   Unitek also presented no specific evidence of how it intends to scale its production process for a consumer market.   Thus, Unitek has not shown a sufficiently strong likelihood of expansion.   *See M2 Software, Inc.*, 421 F.3d at 1085 ("[T]here is a need for a *strong* possibility of expansion into competing markets for this factor to weigh in favor of a finding of infringement."   (brackets and quotation marks omitted) (emphasis in original)).   Regardless, the Court also notes that even if Unitek began selling its ECODIESEL as motor vehicle fuel, Chrysler is not in the market of motor vehicle fuel production and has no plans to enter that market.   The Court is not convinced that a motor vehicle engine and a (potential) motor vehicle fuel are products in significantly similar markets such that confusion is likely to result, particularly

given the high degree of care inherent in the purchase of motor vehicles.

Accordingly, this factor weighs against Unitek.

In sum, the Court concludes that the weight of the preliminary evidence as a whole demonstrates that the reasonably prudent consumer is not likely to be confused as to goods bearing either Unitek's or Chrysler's marks.[3]

### C.   Use of Unitek's ECODIESEL Mark in Commerce

Chrysler additionally opposes the Motion by contending that, as a threshold matter, Unitek is not entitled to Lanham Act protection for its ECODIESEL mark because Unitek has not used the mark in commerce.   Unitek counters that its limited sales of ECODIESEL are sufficient to satisfy the "use in commerce" requirement.   Given the Court's conclusion that Unitek is not likely to succeed on the merits for the reasons discussed above, the Court does not reach a determination, for purposes of this Motion, of whether Unitek's ECODIESEL mark has been used in commerce.   That issue may be addressed further by Chrysler in any later motion it may make to the Court.   The Court notes, however, that it is questionable whether Unitek used the ECODIESEL mark in commerce prior to January 2013, when this action commenced, particularly as to whether the mark was

---

[3] Unitek does not address directly the remaining three *Sleekcraft* factors—evidence of actual confusion; marketing channels used; and type of goods and the degree of care likely to be exercised by the purchaser—in arguing for a likelihood of confusion.

used in commerce for motor vehicle fuel.  *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157 (9th Cir. 2001) ( "The Federal Circuit has held that 'use in commerce,' in the context of a trademark, means 'a bona fide sale or transportation in commerce which may lawfully be regulated by Congress. . . .  This requirement breaks down into two distinct elements: (1) Was the transaction upon which the registration application was founded bona fide; and (2) if it was bona fide, was it followed by activities proving a continuous effort or intent to use the mark.'" (quoting *Avakoff v. S. Pac. Co.*, 765 F.2d 1097, 1098 (Fed. Cir. 1985))).

## II.     <u>Irreparable Harm</u>

Unitek must demonstrate that irreparable harm is *likely,* not just possible.  *Winter,* 555 U.S. at 22.  Courts do not presume irreparable harm in intellectual property cases, nor would Unitek be entitled to such a presumption here because it has not demonstrated a likelihood of success on the merits.  *See eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 392-93 (2006) (rejecting invitation to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 998 (9th Cir. 2011) ("[E]ven in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent."); *AFL*

*Telecommunications LLC v. SurplusEQ.com, Inc*., 2011 WL 4102214, at *3 (D.

Ariz. Sept. 14, 2011) ("Irreparable harm is no longer presumed in a trademark or

copyright case upon a showing of a likelihood of success on the merits.").[4]

Although injury to goodwill and business reputation, as alleged by

Unitek, are generally considered to be intangible and, as a result, irreparable, *cf.*

*MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1305 (C.D. Cal. 2007) ("Harm to

business goodwill and reputation is unquantifiable and considered irreparable."),

with *OG International, Ltd. v. Ubisoft Entertainment*, 2011 WL 5079552, at *10

(N.D. Cal. Oct. 26, 2011) ("The fact that alleged harm is primarily in the form of lost

customers and business goodwill, which at least in theory may be compensated by

damages, weighs against a claim of irreparable harm." (citation and quotation marks

omitted)), the evidence offered in support of such injury has thus far been scant and

speculative, and therefore insufficient to carry Unitek's burden of demonstrating

real and imminent irreparable harm.   Moreover, Unitek's arguments for irreparable

---

[4] While the Ninth Circuit has not yet directly addressed the effect of *Winter* upon the presumption of irreparable harm in the trademark infringement context, it has found that the analogous presumption in the copyright infringement context has effectively been overturned in light of *Winter* and *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006).   *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc*., 654 F.3d 989, 999-1000 (9th Cir. 2011); *Perfect 10, Inc. v. Google, Inc.,* 653 F.3d 976, 978–981 (9th Cir. 2011).   District courts in this Circuit that have addressed this issue have found that the governing law has changed, and a movant is not granted the presumption of irreparable harm upon a showing of likelihood of success on the merits of a trademark

harm are based entirely on a determination of market confusion, which Unitek has failed to establish, as discussed above.

## III.  **Other Factors**

The Court further finds that Unitek has not demonstrated that the balance of hardships tips in its favor or that an injunction is in the public interest.

### **CONCLUSION**

Plaintiff Unitek Solvent Services, Inc.'s Motion for Preliminary Injunction is hereby DENIED.

IT IS SO ORDERED.

DATED: HONOLULU, HAWAI'I, September 30, 2013.



_____
Derrick K. Watson
United States District Judge

---

Unitek Solvent Services, Inc. v. Chrysler Group LLC; CV 12-00704 DKW/RLP;
ORDER DENYING PLAINTIFF UNITEK SOLVENT SERVICES, INC.'S
MOTION FOR PRELIMINARY INJUNCTION

---

infringement claim.  *See BoomerangIt, Inc. v. ID Armor, Inc.,* 2012 WL 2368466, at *4 (N.D. Cal. June 21, 2012) (citing cases).